Oliver "Buck" REVELL,
Plaintiff–Appellant,

v.

David HOFFMAN, an individual; Alexander B. Magnus, an individual; Americans for Responsible Media, a foreign corporation, Defendants–Appellees.

No. 01–6169.

United States Court of Appeals,
Tenth Circuit.

Oct. 30, 2002.

Stan Twardy, Oklahoma City, OK, appearing for the Appellant.

J. Michael Johnston, Oklahoma City, OK, appearing for the Appellees.

Before TACHA, Chief Judge, ALDISERT *, and McWILLIAMS, Circuit Judges.

TACHA, Chief Judge.

## I.  Background

Oliver "Buck" Revell brought suit in federal district court against the defendants, David Hoffman, Alexander B. Magnus, and Americans for Responsible Media ("ARM"), seeking damages for defamation and civil conspiracy under Oklahoma law. Revell also included two other individuals, Gene Wheaton and Paul Hudson, and a foreign corporation, Feral House. Wheaton and Feral House were dismissed, and Hudson declared bankruptcy. On September 5, 2002, this court received the appellee's suggestion of death of Alexander B. Magnus. Thus, only David Hoffman and ARM remain as defendants on appeal.

Plaintiff–Appellant, Oliver "Buck" Revell served in the Federal Bureau of Investigation ("FBI") for thirty years, rising to the position of Associate Deputy Director. Revell also served on the Vice–President's Task Force on Terrorism, the National Foreign Intelligence Board, and the Terrorist Crisis Management and Deputies Committee of the National Security Council. In addition, he served as Vice–Chair of the Interagency Group for Counterintelligence and the President's Commission on Civil Aviation Security and Terrorism. Revell has testified before committees in both the House and Senate and has previously appeared on various national news programs, including *60 Minutes, Face the Nation,* and *Nightline.*

David Hoffman is the author of two books, *The Oklahoma City Bombing and the Politics of Terror* (hereinafter "*Oklahoma City Bombing*") and the unfinished book *Murdergate.* Alexander B. Magnus, through the not-for-profit organization Americans for Responsible Media (hereinafter "ARM"), funded Hoffman's work on both books. *Oklahoma City Bombing* and *Murdergate* both contain statements concerning Revell's activities during his tenure at the FBI. The following passages are from *Oklahoma City Bombing*:

1.  In 1985, Wheaton was approached by security consultants to Vice President Bush's "Task Force on Combating Terrorism" who were working for USMC Lt. Colonel Oliver North and Associate Deputy FBI Director Oliver "Buck" Revell. "They wanted me to help create a 'death squad' that would have White House deniability to assassinate people they would identify as terrorists," said Wheaton.... Wheaton claims the program continues to the present day. (p. 63).

2.  On December 5, 1998, a Palestinian named Samra Mahayoun warned authorities in Helsinki that a Pan Am 747 leaving Frankfurt was to bombed [sic] within two weeks. (p. 170).

    What is interesting is that Oliver "Buck" Revell, former Counter–Terrorism chief of the FBI, pulled his son and daughter-in-law off Pan Am 103 minutes before the flight. Did Revell know something the rest of us did not? (p. 170, n. * *).

* The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

3. Several minutes before flight 103 took off from London's Heathrow airport, FBI Assistant Director Oliver "Buck" Revell rushed· out to the tarmac and pulled his son and daughter-in-law off the plane. (p. 313).

4. "A number of VIPs were pulled off that plane. A number of intelligence operatives were pulled off that plane."

\* \* \*

South African president Peter Botha and several high-ranking officials were advised by state security forces to change their reservations at the last hour. The South African State Security forces have a close relationship with the CIA.

\* \* \*

As in Oklahoma City, this would become the catch-all phrase that would set everything right and prove the government had no involvement. Of course, this would be somewhat difficult in Revell's case, since he pulled his son and daughter-in-law off the plane minutes before it took off. . . . Interestingly, Revell was the FBI's lead investigator in the crash of an Arrow Air DC–8 which exploded on December 12, 1985 in Gander, Newfoundland, with the loss of all 248 personnel. (p. 317).

5. It was also an act that the U.S. shadow government, responsible for precipitating, was anxious to cover up. Had the true cause of the crash—[Oliver] North's double-dealing with the Iranians—been revealed, the Iran–Contra scandal would have surfaced two years before it had. . . . "Buck" Revell would be on hand to make sure it didn't. (p. 318).

6. Oliver North and "Buck" Revell helped develop the policy of militarizing our law-enforcement. One example is the FBI, which is now being given sniper training in the military. That training helped the Bureau massacre 86 people at Waco, the first time in recent history that the government violated the Posse Comitatus Act by using federal troops on American citizens. (p. 382).

According to Revell, *Murdergate* contains similar allegations.

Defendants moved for summary judgment, arguing that Revell is a "public figure" and the First Amendment therefore limits Revell's right to recover for defamation under Oklahoma state law. *See New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The district court agreed and granted defendants' summary judgment motion. The district court held that Revell failed to offer sufficient evidence from which a reasonable jury could conclude that defendants acted with "actual malice," as required under *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710. For the reasons set forth below, we AFFIRM.

## II. Discussion

### A. Standard of Review

◼ We review the district court's grant of summary judgment *de novo*. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir.1992). "In reviewing a grant or denial of summary judgment, we apply the same standard applied by the district court under Federal Rule of Civil Procedure 56(c)." *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 444–45 (10th Cir.1997). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In conducting our review, "[w]e view the evidence in

the light most favorable to the nonmovant." *Campbell*, 962 F.2d at 1521 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). At the same time, "it is not enough that the nonmovant's evidence be 'merely colorable' or anything short of 'significantly probative.'" *Id.* (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505).

In considering whether a fact is material, we must look to the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. To determine whether a dispute is genuine, we must consider whether a "reasonable jury could return a verdict for the nonmoving party." *Id.* In addition, we must incorporate into our summary-judgment determination any heightened evidentiary standard required under the applicable substantive law. *Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1517 n. 8 (10th Cir.1994) ("Summary judgment 'necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.'") (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505). Applying this standard, we conclude that Revell is unable to establish a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Liability for Defamation

■ Revell seeks to recover damages for defamation under Oklahoma law. The First Amendment, however, "prohibits a *public official* from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with '*actual malice.*'" *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710 (emphasis added). Accordingly, we must first consider whether Revell is a "public official" for First Amendment purposes.

### 1. Status as Public Official

In *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court articulated the test for determining whether a person is a public official under the First Amendment. The Court held that the "'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* at 85, 86 S.Ct. 669.

■ The district court found that Revell had a "[thirty-year] career in the government, in particular the high echelons of the FBI where he had an influential role in fundamental issues of this country's national and foreign policy." Dist. Ct. Order at 9. We have no doubt that Revell's various governmental positions are of "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt*, 383 U.S. at 86, 86 S.Ct. 669. Further, we have previously held that law-enforcement personnel are "public officials" for First Amendment purposes. *See Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir.1981) (citations omitted).

Revell argues, however, that he is no longer a public official, as he has now retired from the FBI. We disagree. In *Udevitz*, we noted:

That the person defamed no longer holds the same position does not by itself strip him of his status as a public official for constitutional purposes. If the defamatory remarks relate to his conduct while he was a public official and the manner in which he performed his responsibilities is still a matter of public interest, he remains a public offi-

cial within the meaning of *New York Times.*

*Id.* at 591 n. 3 (citing *Rosenblatt,* 383 U.S. at 87 n. 14, 86 S.Ct. 669).

Under *Udevitz* and *Rosenblatt,* we hold that Revell is a public official for First Amendment purposes. *See Rosenblatt,* 383 U.S. at 85, 86 S.Ct. 669; *Udevitz,* 656 F.2d at 591. In order to recover damages for defamation, Revell must therefore prove that defendants acted with actual malice. *See New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710. Further, Revell must prove actual malice by clear and convincing evidence. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Accordingly, we proceed to consider the actual malice inquiry under *New York Times* and its progeny.

### 2. Actual Malice

■ Actual malice exists where a party publishes a defamatory statement "[1] with [actual] knowledge that it was false or [2] with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. 710. Although reckless disregard "cannot be fully encompassed in one infallible definition," *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court has made clear that "[t]he mere failure to investigate cannot establish reckless disregard for the truth." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 332, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Rather, there must be "sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323 (emphasis added). This inquiry is "a *subjective* one—there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of ... probable falsity.'" *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct.

2678, 105 L.Ed.2d 562 (1989) (emphasis added). Reckless disregard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323.

Revell proffers no evidence indicating that Hoffman entertained doubts regarding the truth of the statements in *Oklahoma City Bombing.* Throughout his brief, Revell characterizes the existence of malice as facially "apparent" and "obvious" based on the "inherent improbability" of Hoffman's statements. Revell argues that "malice here is evidenced by both the specific statements and the totality of the book."

■ Revell confuses what might be considered *some* evidence of actual malice with what, standing alone, will suffice to carry his burden of proving actual malice. Even if we were to accept that Hoffman's statements were "inherently improbable," this would merely lessen—rather than meet—Revell's burden of offering some extrinsic evidence of Hoffman's actual malice. *St. Amant* makes quite clear that *New York Times* requires "either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity.'" *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. Actual malice is a *subjective* inquiry; it is not based on whether a "reasonably prudent" person would have conducted further investigation prior to publishing. *Harte–Hanks Communications,* 491 U.S. at 688, 109 S.Ct. 2678. Because Revell fails to offer *any* evidence concerning defendant's subjective state of mind, we have before us no "concrete evidence from which a reasonable juror could return a verdict in his favor." *See Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505.

Further, we have no evidence that Hoffman purposefully avoided the truth. On

the contrary, Hoffman did conduct an investigation prior to publishing,[1] and we have no facts before us that might call into question the veracity of Hoffman's sources. *Cf. id.* at 691, 109 S.Ct. 2678 (citing *St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323). In short, Revell has failed to point to any evidence, aside from his allegations of "inherent improbability," that would support a jury finding of actual malice. Requiring publishers to finance trials based on such nebulous allegations would severely burden First Amendment rights.

Under *Rosenblatt,* Revell is a public official. *See Rosenblatt,* 383 U.S. at 85, 86 S.Ct. 669. Accordingly, he may not recover damages for defamation under state tort law absent a showing of actual malice. *See New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710. Revell has failed to offer any evidence that Hoffman published *Oklahoma City Bombing* with actual malice. Likewise, Revell has failed to show that ARM acted with actual malice. *See St. Amant,* 390 U.S. at 730, 88 S.Ct. 1323 (actual malice must be proved separately as to each defendant). Accordingly, the district court properly granted the defendants' motion for summary judgment on Revell's defamation claim.

## C.  Civil Conspiracy

▆▆▆▆ Revell's alleged as part of his complaint that ARM conspired with Hoffmann to commit defamation. Under Okla-

1.  Hoffman relied upon several sources, including: (1) a Public Broadcasting System-sponsored book and a 1995 documentary, both accusing Revell of efforts to obstruct justice in collaboration with former Marine Lt. Col. Oliver North; (2) an essay by Hart Lidov highly critical of Revell, posted on the website *Columbia Journalism Review, USA* (www.cjr.org); (3) an article by Gene Wheaton, formerly with the U.S. Army Criminal Investigation Command, published in 1996 by

homa law, "[t]here can be no civil conspiracy where the *act* complained of and the *means employed* are lawful." *Brock v. Thompson,* 948 P.2d 279, 294 (Okla.1997). "Constitutionally protected speech that renders a defamation claim nonactionable also serves to defeat a claim of conspiracy where the means allegedly employed to achieve that purpose are lawful." *Id.* Accordingly, because we affirm the district court's grant of summary judgment on Revell's defamation claim, Revell's civil conspiracy claim similarly fails. Thus, the district court properly granted the defendants' motion for summary judgment on Revell's civil conspiracy claim.

## III.  Conclusion

For the reasons set out above, we AFFIRM.

the Portland Free Press, in which Wheaton alleges that several security consultants, including Revell, approached him proposing to create a "Death Squad"—a group to assassinate individuals identified as "terrorists" by the White House; and (4) statements of Paul Hudson, an attorney and the head of the Pan Am 103 survivor's group, concerning the alleged advance warning of the Pan Am 103 bombing and allegations that Revell pulled his son off of Pan Am 103.