**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 2004**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

GIOVANNA DIRUSSO,

Plaintiff,

and

SUZANNE NIVETTE,

Plaintiff-Appellant,

v.

ASPEN SCHOOL DISTRICT NO. 1,
also known as The Aspen School
District Board of Education, a public
school district organized and operated
pursuant to Colorado law,

Defendant-Appellee.

No. 03-1334
(D.C. No. 01-M-1501)
(D. Colo.)

---

ORDER AND JUDGMENT  *

---

Before **ANDERSON** and **BALDOCK** , Circuit Judges, and **MARTEN** ,** District
Judge.

---

\*      This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

\*\*      The Honorable J. Thomas Marten, District Judge, United States District
Court for the District of Kansas, sitting by designation.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff-appellant Suzanne Nivette appeals from summary judgment granted in favor of her former employer, defendant-appellee Aspen School District, on her claims of age discrimination and retaliation in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, which she brought after resigning from her teaching position. Our jurisdiction arises under 28 U.S.C. § 1291. We conclude that Nivette's resignation does not moot the issue of the District's potential liability for discrimination in refusing to rehire Nivette because it is undisputed that Nivette resigned only after notification that she would not be rehired. Thus, her resignation has no impact on our analysis in this case. But we conclude that the District was entitled to summary judgment on the failure-to-rehire claim because Nivette could not produce evidence tending to show that age was a determinative factor in her supervisor's decision not to rehire her or that the reasons given for not rehiring her were pretextual. As to Nivette's claim of retaliatory discrimination, which is based on a conversation during which the District's superintendent informed a prospective employer that Nivette had filed a discrimination claim against the District, we hold that no reasonable jury

could conclude that the conversation supports a retaliation claim.  We therefore affirm the district court's grant of summary judgment on both claims.

## I.  Standard of review

"We review the district court's grant of summary judgment *de novo* , applying the same legal standard used by the district court" under Fed. R. Civ. P. 56(c).  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

> In applying this standard, we view the evidence and draw any inferences in a light most favorable to the nonmoving party, but the party must identify sufficient evidence that would require submission of the case to a jury.  It is not enough that the nonmovant's evidence be merely colorable or anything short of significantly probative .

*Jensen v. Redevelopment Agency*, 998 F.2d 1550, 1555 (10th Cir. 1993) (citations and quotations omitted).    "In considering whether a fact is material, we must look to the applicable substantive law.  To determine whether a dispute is genuine, we must consider whether a reasonable jury could return a verdict for the nonmoving party."  *Revell v. Hoffman*, 309 F.3d 1228, 1232 (10th Cir. 2002) (quotation and citation omitted).

## II.  Undisputed relevant facts

In May 1998 Lisa Halverson, the District's director of special education and high-school assistant principal in charge of hiring special education teachers, advertised a half-time high-school "inclusion facilitator" position.  *See* Aplt. App.

Vol. IV at 673. Historically, there has been a shortage of special education teachers in Colorado, and the District had a difficult time hiring qualified special education teachers. *Id.* at 524. Nivette was fifty years old at the time she submitted her application, and she did not apply until July 13. Nivette's application indicated that, although she had "redeveloped" a special education/Title I reading program in the 1997-1998 school year, it had been seven years since she had taught special education, but she was still qualified to teach special education. Aplt. App. Vol. II at 151.

On July 15, Halverson initially recommended to the District that it hire Ms. Cheri Hasenburg, who was in her mid-to-late thirties and who had specifically expressed an interest in the half-time high-school position on her application submitted in June . When Hasenburg later notified Halverson that she could not accept the job because she could not find housing, Halverson interviewed Nivette and offered her the job.

Nivette signed a one-year, probationary contract for the "inclusion facilitator" position. A key part of this position is effective communication with regular classroom teachers and paraprofessionals who assist the special education teacher in making curriculum modifications so that special education students can participate in regular classroom instruction. Nivette had never taught in an inclusion program before. She found it a challenge to serve five severe-needs

students within her twenty-hour work schedule. She complained to Halverson and to other teachers that she could not do her teaching job and work other jobs in order to support herself in Aspen.

Halverson observed and evaluated Nivette several times. A December 1998 evaluation indicated that Nivette needed to improve her performance in understanding the district curriculum and state content standards, assisting in special education assessments, and meeting with regular classroom teachers on a consistent basis. Halverson testified that Nivette was not happy with having to attend special training sessions. She also testified that the classroom teachers complained that Nivette had not established a collegial working relationship with them and was not available to, and did not consistently check in with, them, and that Nivette did not talk to them as equal colleagues. In March 1999, Halverson intervened in an on-going conflict Nivette was having with one of the special education paraprofessionals who worked with her. Halverson was concerned that Nivette had communicated to students and other teachers about the problem.

At her second evaluation conference, held in April 1999, Halverson informed Nivette that she would not recommend that Nivette's teaching contract be renewed. Halverson testified about her reasons for deciding not to renew Nivette's contract:

> [A]s an inclusion facilitator, [Nivette] needed to maintain good
> communication skills with the teachers with whom she was working

and [I] felt that she had not demonstrated that consistently; that she had some difficulties in communicating with the staff regarding students' [individual educational programs] and in looking at making some curricular modifications for them, . . . [I] felt . . . that it was not a good fit for her as an inclusion facilitator, that her skills were not suited to that particular role.

Aplt. App. Vol. IV at 673. Halverson testified that teachers complained that Nivette had performed curriculum modifications that were too simplistic because they only reduced the quantity of work required, and that Nivette had not identified curriculum objectives to students or teachers before the teachers began their instruction on a particular unit. Nivette was perceived as not listening to colleagues and not being receptive to new learning. Halverson saw little evidence of Nivette facilitating or fostering social relationships between her students and their peers. But Halverson had no criticism of Nivette's skills as an instructor.

A classroom teacher who worked with Nivette testified that, although she personally had no complaints about Nivette's performance, "the word on the street was that [Nivette] was not doing her job," and she knew that "people were bringing concerns [about Nivette] directly to Lisa Halverson throughout the year." *Id.* at 708. She testified that another special education teacher "ran screaming 'fire'" to Halverson about Nivette's job performance. *Id.* Words the teacher had heard used to describe Nivette were "flaky, flighty, very involved personal problems, inconsistent." *Id.*

A special education paraprofessional testified that Nivette attended only one class in a series of monthly classes the District offered for paraprofessionals and new special education staff to teach them how to effectively implement inclusion concepts. She testified that, "it seemed as if [Nivette] misrepresented herself on what she knew [about inclusion concepts]," and that Nivette said she had not taught special education in quite a while. *Id.* at 714.

Halverson did not offer to place Nivette on a remediation plan to improve her performance even though District policies had provisions for doing so and at least one inexperienced probationary teacher at the high school had been placed on a remediation plan in the past. But Halverson gave Nivette the opportunity to resign in lieu of recommending to the District that Nivette's contract not be renewed. Halverson told Nivette she would write a letter of recommendation for her if she resigned.

Nivette appealed in writing Halverson's decision not to rehire her to Tom Farrell, the superintendent of the District. He informed Nivette on May 10 that Halverson was responsible for high-school special-education-teacher evaluations and for hiring special education staff for the following school year, but invited Nivette to set up a meeting with him. They met on May 14, and Farrell told Nivette that he would talk with Halverson to see if her mind was made up about not rehiring Nivette in the fall.

That same day, Nivette submitted a letter of resignation to Farrell. In her deposition, she explained that she felt pressure to resign before Halverson's recommendation not to renew her contract was made to the District, as such a recommendation could have negative consequences on her ability to obtain another teaching position. The letter explained that Nivette needed full-time work and that she felt that it took more than twenty hours per week to create an efficient, manageable special education program for the students she served. Thus, Halverson did not recommend nonrenewal of Nivette's teaching contract to the District, and the District accepted Nivette's resignation in its May 17 meeting. Halverson wrote a letter of recommendation for Nivette on May 27. Halverson subsequently interviewed and hired a fifty-one-year-old special education teacher to replace Nivette on July 27, 1999. Nivette filed age discrimination charges with the EEOC in January 2000.

In the spring of 2000, Nivette interviewed for, and was offered, a teaching position in Durango after Farrell had spoken with the Durango administrator in charge of hiring. Nivette subsequently accepted another, higher-paying job in Summit County. Nivette filed suit against the District on August 2, 2001. The district court granted summary judgment to the District on Nivette's claims, and this appeal followed.

## II. Discrimination

Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

> To prevail on an ADEA claim a plaintiff must establish that age was a determining factor in the employer's challenged decision. The plaintiff need not prove that age was the *sole* reason for the employer's acts, but must show that age made the difference in the employer's decision. Under our precedents, an ADEA plaintiff may proceed by either of two general methods to carry the burden of making her or his case. A party may attempt to meet his burden directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge. Or, more typically, a party may rely on the proof scheme for a *prima facie* case established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252-56 (1981).

*Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557-58 (10th Cir. 1996) (quotations and citations omitted).

The District moved for summary judgment on Nivette's age discrimination claim on the bases that (1) she could not establish that she suffered an adverse employment action because she resigned; and (2) she was not replaced by a younger teacher, and therefore could not create a prima facie case of age discrimination. Aplt. App. Vol. II at 85. Nivette submitted a vigorous response,

challenging the District's legal theories and alleging multiple examples of what she claims is direct evidence of both discriminatory motive and pretext.

**A. Constructive discharge.** The District argued that, because she resigned, Nivette had to rely on the theory of constructive discharge and could not meet the requirements of that theory because she could not establish that her working environment was so intolerable that a reasonable person in her position would have felt compelled to quit. *Id.* at 85-86. In response, Nivette argued that she was constructively discharged because she was given no choice but to resign or be terminated.

The District was incorrect in its premise that the only way Nivette could show an adverse employment action under the ADEA was to prove that she was constructively discharged. Section 623(a)(1) specifically prohibits an employer from discharging "or otherwise discriminat[ing] against any individual with respect to his . . . terms . . . of employment, because of such individual's age." We consider whether a particular action was adverse on "a case-by-case approach, examining the unique factors relevant to the situation at hand." *Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1217 (10th Cir. 2003) (internal quotation marks omitted). Here, Nivette claimed that Halverson's decision not to recommend renewal of her contract was motivated by age discrimination. It is this decision that forms the adverse action required, and Nivette did not have to prove that she

was constructively discharged.    *Cf. Cole v. Ruidoso   Mun. Sch.,*  43 F.3d 1373 (10th Cir. 1994) (holding, in Title VII case, that plaintiff demonstrated adverse employment action in school district's decision not to renew principal's contract for the following year, but offering principal a demotion).

**B. Resignation.**   The district court properly rejected the constructive-discharge theory presented by the District, noting that, because Nivette's contract was only for one year and she completed the whole contract, there had been no termination and therefore no constructive discharge.  The district court viewed the contract nonrenewal as a "failure to hire" case.  Aplt. App. Vol. VII at 1042.

> In *McDonnell Douglas,*   the Supreme Court enumerated the elements required in order for a plaintiff to establish a prima facie case in the failure to hire context.  These are:  (i) plaintiff belongs to a protected class; (ii) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (iii) despite being qualified, the plaintiff was rejected; and (iv) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications.

*Kendrick v. Penske Transp. Servs., Inc.*     , 220 F.3d 1220, 1226 (10th Cir. 2000) (internal quotation marks and citations omitted).  The district court dismissed the discrimination charge without discussing its rationale for doing so and finding only that "this . . . is not a compensable coerced resignation."  Aplt. App. Vol. VII at 1053.  The district court must have agreed with the District that, since she resigned, Nivette could not satisfy    *Kendrick's*   second requirement–that she applied for the job.  But

-11-

> [e]mployment discrimination law does not require that a plaintiff formally apply for the job in question. Rather, the law requires either that the employer be on specific notice that the plaintiff seeks employment or, where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job.

*Whalen v. Unit Rig, Inc.* 974 F.2d 1248, 1251-52 (10th Cir. 1992). Here, it is undisputed that Halverson knew that Nivette desired to keep her job, and that Nivette resigned only because she knew that Halverson was not going to rehire her. We therefore conclude that the district court improperly granted summary judgment on Nivette's age discrimination claim on the ground that there was no compensable coerced resignation. Thus, we move to the question whether Nivette presented sufficient evidence that age discrimination was a determinative factor in the decision not to renew her teaching contract.

**C. Discriminatory motive/pretext.** Nivette was not required to show that the District hired an individual who was not in her protected class in order to establish a prima facie case of age discrimination. *See Kendrick,* 220 F.3d at 1231. But because Halverson subsequently hired an individual who was the same age as Nivette, once the District came forward with a non-discriminatory reason for not rehiring Nivette, Nivette could not rest on her prima facie showing alone to get the age-discrimination question to a jury. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000) (holding that ADEA plaintiff had failed to make a prima facie case of age discrimination when he was replaced by

-12-

someone only two years younger and within the protected age group and there was no other evidence of age discriminatory motive). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Kendrick*, 220 F.3d at 1227; *see O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311-12 (1996) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption.") (citation and quotations omitted).

**1. Pretext.** In order to withstand summary judgment, Nivette must come forward with "evidence that [Halverson's] proffered reason for the employment decision was pretextual–i.e. unworthy of belief." *Kendrick*, 220 F.3d at 1230.

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false ; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Id.* (citations omitted). Critically, Nivette did not present any evidence to rebut Halverson's evaluation of Nivette's skills as they related to being a good "inclusion facilitator" or to cast doubt upon Halverson's concerns with Nivette's problems in communicating and working with other staff. *Cf. Munoz*, 221 F.3d at

-13-

1167-68 (affirming grant of summary judgment because plaintiff failed to rebut reasons for plaintiff's termination). The record contains nothing to indicate that Halverson's concerns were not honest or that they were not based on her evaluations and information given to her by Nivette's peers and co-workers. But Nivette points to two facts as evidence of pretext:

(a) Nivette and her co-plaintiff, Giovanna DiRusso, were the only teachers Halverson ever recommended for non-renewal, and they were both in the protected age group. We decline to compare DiRusso's situation with that of Nivette's because they are too different. [1] It is uncontroverted that Griff Smith, DiRusso's principal, recommended with Halverson that DiRusso's contract not be renewed. Aplt. App. at 109, 190, 196. The fact that Nivette is the only teacher Halverson ever solely recommended for non-renewal, by itself, will not give rise to an inference of age discrimination in light of the valid, non-discriminatory reasons Halverson gave for not renewing Nivette's contract and in light of the fact that she hired another person Nivette's age to fill the position. Further, Nivette does not present any evidence regarding how many older teachers

---

[1]     For example, DiRusso did not have a Colorado teaching certificate and never obtained one; Griff Smith (her principal) made the final decision not to renew her contract; Smith gave different reasons for not renewing the contract, and DiRusso challenged Smith's recommendation. The District's motion for summary judgment against DiRusso was denied, but the district court certified Nivette's judgment for immediate appeal under Fed. R. Civ. P. 54(b). Aplt. App. Vol. VII at 1083.

Halverson recommended for renewal, and without a number to compare to, the recommendation for non-renewal of one older person in ten years is virtually meaningless.

(b) Halverson did not give Nivette a remediation plan, as required by District policy, but the high-school principal gave a young, probationary teacher that opportunity two years before. First, Nivette's citation to the record does not support her claim that District policy requires giving a probationary teacher a remediation plan in all circumstances. Nivette did not submit the policy in her summary judgment materials, but, rather, relied on a Board member's testimony that he "assumed" that the policy applied to probationary teachers. Aplt. App. Vol. IV at 659. Second, the fact that a different administrator offered a teacher with no previous teaching experience an opportunity to go to summer school and to quit coaching in order to improve his teaching skills has no bearing on the very different situation Halverson faced. *See Rivera*, 365 F.3d at 923 ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.") (quotation omitted). No comparison between the two situations is reasonable, given that Halverson believed Nivette's skills were not suited to the job, Nivette had failed to attend seminars to improve her skills, Nivette was an experienced teacher, and Nivette had personality conflicts and difficulty in communicating with other staff.

-15-

**2. Discriminatory motive.**

**a. Farrell's alleged discriminatory policy.** In response to the district court's inquiry regarding what evidence could support a finding that Halverson was motivated by age, Nivette first stated: (1) "Farrell had the ability to discipline Halverson without any input from the board," (2) "Halverson went to Farrell and discussed Nivette's situation about whether or not to recommend renewal . . . before she made the decision," and, therefore, (3) "all the ageist policies attributed to Farrell are in this decision-making process. It's tainted by those two facts." Aplt. App. Vol. VII at 1043-44. She also claimed that (4) ageism was a district-wide policy that Halverson simply enforced.

It is undisputed that Halverson made her employment decision independently, before she informed Farrell of her decision, and that she was the decision-maker. *See* Aplt. App. Vol. IV at 673; *id.* Vol. VII at 1035, 1039. Even though we view the facts in the light most favorable to Nivette, "a challenge of pretext requires us to look at the facts as they appear to the person making the [adverse employment] decision." *Kendrick,* 220 F.3d at 1231. Because Halverson made the decision not to rehire Nivette, we must view the facts from her perspective. *See id.* "The relevant inquiry is not whether [Halverson's] proffered reasons were wise, fair or correct, but whether [she] honestly believed

-16-

those reasons and acted in good faith upon those beliefs." *Rivera*, 365 F.3d at 924-25 (quotation omitted). Thus, assuming, for the purposes of our analysis, that Farrell had a policy of recruiting teachers right out of college,[2] we reject Nivette's argument in points (1)-(3), *supra*, that it should be attributed to Halverson. *Cf. Kendrick*, 220 F.3d at 1231.

**b. The District's alleged discriminatory policy.** We also reject Nivette's claim that she presented sufficient evidence of a District policy of hiring only young teachers that Halverson simply enforced. Nivette argues that ageism is demonstrated by the facts that the District (1) sought to hire former Aspen students and secured outside funding to create a position for a former student under forty who had become a teacher; (2) sought to develop relationships with college placement officers as part of its recruiting strategies; (3) looked for teachers trained in the "best practices methodology;" (4) wanted to hire teachers "who were quality educators and were knowledgeable of . . . recent practice;"

---

[2] The fact that an individual has just obtained a teaching certificate and is "new" to the profession does not necessarily mean that the individual is also "young." Further, the newspaper article Nivette submitted as "proof" of Farrell's ageist policy shows that the author used the word "young" as a substitute for "new" or "inexperienced," noting that the school district wanted to hire "young teachers–fresh out of college or with a couple years of experience," that by "recruiting young teachers, the district estimates . . . salary savings by paying less to entry-level teachers than it would to veterans" and that "veteran teachers earn $64,000 a year whereas entry-level teachers earn $25,000 a year." Aplt. App. Vol. IV at 625.

(5) had received a report that "[s]ome veteran teachers are feeling undervalued" because of the salary schedule, Aplt. App. Vol. IV at 924-25; (6) had discussed the concept that "the closer people are in age to the technological revolution, then the more technologically savvy they tended to be;" and (7) had "discussed the advantages and disadvantages of hiring younger teachers" and the idea that "older teachers . . . might be burned out and not as enthusiastic" at one meeting. Aplt. Br. at 19, 20. But none of facts (1)-(5) are necessarily connected to age, and "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993).

Further, as to fact (1), it is not ageist to desire former residents because they are more likely to remain in the area. Regarding fact (2), the most likely place to find unemployed, qualified teachers, no matter their age, is through college placement officers, and it is not ageist to recruit at a college. Nor is it ageist as alleged in facts (3) and (4), to desire teachers who are trained in the best practices. Indeed, the District showed that it makes sure that its teachers are all offered "best practices" instruction on a regular basis. Aplt. App. Vol. IV at 681.

As to fact (5), it is further undisputed that, when Farrell received the report stating that some veteran teachers perceived that they were valued less than new teachers, he noted that the teachers had proposed both the salary schedules, which

-18-

gave new teachers a proportionally-higher starting salary than veteran teachers, and a three-year early retirement plan. He also noted that, "there is little advantage to the District to early retire good teachers because the District can't replace them." *Id.* at 925.

Fact (6), that the Board discussed a stereotypical concept, does not indicate that it actually used that concept to reject older applicants, and a teacher testified that the District has done "a really good job" of providing in-service technology training to all the teachers. *Id.* at 706. And as to "fact" (7), the record reflects that the Board member was testifying in response to Nivette's counsel's question regarding whether he thought *Farrell* believed there were advantages to hiring younger teachers as opposed to older teachers. *Id.* at 693. The record shows that the Board member interpreted the words "younger" vs. "older," in discussing teaching applicants, as "new" vs. "experienced" – not in terms of actual age. *See id.*; *Hazen Paper Co.*, 507 U.S. at 611 (noting that "an employee's age is analytically distinct from his years of service"). Thus, the record shows that the Board member did not testify that Farrell or the District thought "older" teachers might be burned out; he stated, "with experienced teachers[,] the potential negatives were that they might be burned out, they might not be as enthusiastic as they were originally." *Id.* Thus, none of Nivette's evidence is sufficient to raise a genuine issue whether the District had a policy of hiring only young teachers or

of not hiring older teachers, or of using age as a determinative factor in the hiring decisions.

Further, a teacher who served on several of the District's hiring committees testified that she did not believe that the District sought out young teachers or ever used age as a deciding factor in determining who to hire. She testified that, although administrators "may like young new teachers, that would never be the deciding factor. It would be who's best for the job." *Id.* at 706.

**c. Evidence of Halverson's discriminatory motive.** Nivette submitted the following "facts" as direct or circumstantial evidence of Halverson's alleged discriminatory motive, and we address each seriatim:

(1) Halverson testified that "she believes that one of the advantages of hiring younger teachers is that they come out of training having 'new practices, best practices.'" Aplt. Br. at 19; Aplt. App. Vol. VII at 1045. This statement mischaracterizes the record. Halverson answered "no" to the question, "was there a sense at the school district that the newer teachers coming out of school now were better because they had better training or better practices." Aplt. App. Vol. IV at 678.

(2) Halverson stated "that younger teachers can relate to some of the adolescent issues . . . and that somebody who's younger may have more similar experiences to adolescents." Aplt. Br. at 19; Aplt. App. Vol. IV at 1045. This

statement also mischaracterizes the record. In response to the question, "[d]o you think . . . you can generalize, although there may be exceptions, where the younger you are and the more recently you went through being an adolescent, the easier it is for you to relate to that?", Halverson answered, "I don't think you can generalize that, no." Aplt. App. Vol. IV at 681. And even if Halverson believed that younger teachers may relate more easily to adolescent issues because they have been more recently confronted with those issues themselves, that would not be indicative that Halverson employed age as a determinative factor in Nivette's non-renewal.

(3) Hasenburg, who was younger than Nivette, was offered the high-school position before it was offered to Nivette. Without more, no reasonable jury could infer from this fact that age played the determinative role in Halverson's decision not to *renew* Nivette's contract a year later, especially in light of the undisputed facts that Nivette submitted her application only two days before Halverson made her hiring recommendation to the District, Hasenburg was the only candidate who specifically expressed an interest in the position on her application, Hasenburg submitted her application more than a month before Nivette did, and Nivette had no experience in the inclusion facilitation position offered.

(4) Nivette, DiRusso, and Carolyn Hogue, Nivette's replacement, were not hired until July of each year, but the majority of the regular teachers were hired

earlier in the summer of both years, supporting an inference that Halverson hired older teachers only after she could not find anyone younger. It is undisputed that Nivette and DiRusso were hired late in the summer because the teachers they replaced either reneged on accepting the job or resigned unexpectedly late in the year. And it is undisputed that young special education teachers, such as DiRusso's replacement, were also hired late in July. It is also undisputed that Hogue, who was fifty-one, was the only person Halverson interviewed for the job Nivette had held, and that Halverson did not even advertise the position once Hogue indicated her interest. And it is undisputed that there is a shortage of qualified special education teachers in Colorado. No inference of age discrimination could be reasonably gleaned from these undisputed facts.

We conclude, as a matter of law, that Nivette's proffered evidence does not reasonably give rise to an inference that the reasons Halverson gave for not renewing Nivette's contract were pretextual or that Halverson utilized age as a determinative factor in her employment decision. We therefore conclude that summary judgment was properly granted to the District on the age discrimination claim.

### III. Retaliation

The ADEA's anti-retaliation provision forbids an employer from discriminating against an employee because she "has opposed any practice made

unlawful" by the statute, or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the statute. 29 U.S.C. § 623(d). The anti-retaliation provisions of Title VII "are materially identical" to the ADEA's provisions. *Twisdale v. Snow,* 325 F.3d 950, 952 (7th Cir.), *cert. denied,* 124 S. Ct. 957 (2003). To establish a prima facie case of retaliation under the ADEA, Nivette must show (1) she engaged in protected activity; (2) she suffered adverse action at the District's hands either after, or contemporaneously with, her protected activity; and (3) a causal connection exists between her protected activity and the adverse action. *See Corneveaux v. CUNA Mut. Ins. Group,* 76 F.3d 1498, 1507 (10th Cir. 1996). Adverse employment action is something that "disadvantage[s]" the employee. *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir. 1982) (stating that Title VII retaliation plaintiff must show "she was disadvantaged by an action of her employer"). "The causal-connection element of a prima facie retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

Nivette alleged retaliation based on a single conversation between the principal of Durango High School, Gene Giddings, and Farrell, after Giddings contacted Farrell for a reference. Farrell initially told Giddings that he could not

-23-

provide a reference because he had never observed Nivette's teaching skills, and that he should call Halverson. Giddings stated he had tried, but Halverson was not available. Giddings testified that Farrell "did not make any negative statements about Ms. Nivette," and "at no time stated or suggested that [Giddings] should not hire [her]." Aplt. App. Vol. II at 265. When Giddings asked whether Farrell could foresee any problems with hiring Nivette, Farrell answered, "no." *Id.*, Vol. IV at 619. When pressed to answer whether Nivette resigned on her own or was under pressure, Farrell responded that he thought there was some pressure. Giddings then asked whether Nivette's resignation was amicable, and Farrell responded that he "was hearing [Nivette] had a lawsuit against the District." *Id.* Giddings responded that he was going to recommend Nivette for hire anyway, and Farrell responded that he would, too, if he were in Giddings' position.

Giddings called Nivette and asked if she had a lawsuit against the Aspen Schools. Nivette responded, "not right now," but told him that she had filed an EEOC complaint against the District. *Id.* at 605. Giddings offered, and Nivette initially accepted, the Durango teaching position, but she later reneged to accept a higher-paying job.

At the hearing, the district court and Nivette's counsel had the following colloquy:

> Court: What disadvantage did Ms. Nivette suffer from Farrell's conversation?

Counsel: She had the humiliation of being questioned by a potential employer about legal action she had against a very similar employer . . . and she had the uncomfortable feeling that, even if she got the job offer, which probably was going to go in the tank, if she got –

Court: Do you think uncomfortable feelings are compensable under this law?

Counsel: I think under *Jeffries [v. Kansas*, 147 F.3d 1220 (10th Cir. 1998)], and under *Berry [v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996)]. *Berry* had no employer calling to ask questions, a theoretical employer out there. *Berry* said damage to reputation and humiliation resulting from that create the adverse employment action. She had humiliation. She had, like the plaintiff in *Berry*, she had damage to her reputation by somebody she wanted to have a long-term employment relationship with. . . . I think we forget that the word "lawsuit" carries a very derogatory [connotation] for average Americans. And I believe the jury would have no problem seeing that as a retaliatory act.

Aplt. App. Vol. VII at 1052-53. The district court concluded that summary judgment was appropriate for Nivette's retaliation claim because "there just isn't any injury. Now, I don't dispute Ms. Nivette's feelings about it, but there's a difference between harm that we experience and harm that is a basis for a lawsuit." *Id.* at 1053.

On appeal, Nivette argues that she does not have to show actual injury in order to prevail on a retaliation claim; she only has to show retaliatory intent. In her brief on appeal, Nivette also cites *Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir. 1977). In that case, we affirmed a district court's finding that the following facts established an intent to retaliate: (1) the former

-25-

employer gave a "highly complimentary letter of recommendation" before the plaintiff filed a discrimination claim, but (2) after she filed her complaint, the employer "volunteered" to a prospective employer that she had filed the charge and (3) informed the plaintiff that an updated reference letter would "set forth the circumstances surrounding her termination . . . and would mention the fact that she had filed a discrimination charge," and (4) the prospective employer decided not to hire the plaintiff after its conversation with the former employer. 565 F.2d at 1163-64. The facts in Nivette's case are clearly distinguishable from those in *Rutherford* .

Nivette also argues that, because she had not filed a lawsuit against the District at the time Farrell responded to Giddings that he "was hearing [Nivette] had a lawsuit against the District," Aplt. App. Vol. IV at 619, Farrell's statement was false, and was an adverse action as a matter of law because it had a potential effect of interfering with prospective employment. *See Berry* , 74 F.3d at 986-87 (adverse employment action under Title VII encompasses acts that carry a "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects").

We first note that the facts in this case are easily distinguishable from those in *Berry.* In *Berry* , the employer's agent falsely accused a former employee of committing felonies, which is cause for humiliation and which would have an

-26-

obvious impact on future employment. *See id.* at 983-86. It is not similarly humiliating for a prospective employer to become aware of the truth that an applicant has filed EEOC charges against a former employer. But we recently held that a Title VII plaintiff whose former employer gave negative references to a prospective employer in retaliation for the employee's prior discrimination complaints did not have to prove that she would have received the prospective job but for those negative references to establish an adverse employment action. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1029 (10th Cir. 2004). Instead, she must show only that the negative action would have "a likely effect on future job opportunities." *Id.* We specifically excluded from the definition of "adverse employment actions," however, "those acts that merely have a *de minimus* impact upon an employee's future job opportunities." *Id.* at 1033. Thus, in *Hillig* we found sufficient evidence of more than *de minimus* harm to the employee because "the negative references were very unfavorable," and, therefore, carried a significant risk of harm to future employment prospects. *Id.* at 1035.

Assuming, without deciding, that the Title VII standards for determining what is an adverse employment action should be used in ADEA cases and that informing future employers that discrimination charges have been filed may provide an inference of retaliatory intent, we conclude that no reasonable jury could hold that the single conversation Farrell had with Giddings carried a

-27-

significant risk of harm to her future employment. It is undisputed that Halverson gave Nivette an excellent job reference and Farrell did not detract from that reference. While Farrell informed Giddings that Nivette may have a legal action against the District, he made no negative statements about her, did not suggest that Giddings should not hire Nivette, and in fact told Giddings that he would offer Nivette a teaching job if he were in Giddings' position, and Giddings followed that recommendation. Thus, under these undisputed facts, we conclude that summary judgment was properly granted to the District on Nivette's retaliation claim.

The judgment of the district court is AFFIRMED.

Entered for the Court

Stephen H. Anderson
Circuit Judge